Filed 8/11/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| GARY BIRDSALL et al.,<br><br>　　　Plaintiffs and Respondents,<br>v.<br><br>BARTON HELFET,<br><br>　　　Defendant and Appellant. | A170596<br><br>(San Francisco County<br>Super. Ct. No. CGC-21-594428) |

Gary Birdsall was stopped on the Bay Bridge when his vehicle was rear-ended by Barton Helfet. Gary and his wife Pamela retained an attorney who initiated contact with Helfet's insurer and who, prior to filing suit, sent the insurer a "policy limits settlement demand" of $100,000. The demand stated that the deadline to accept was 31 days later, at 3:00 p.m., by which the insurer had to send the attorney three items: (1) a "standard . . . bodily injury release" to be executed by "Gary Birdsall and Pamela Birdsall," (2) a settlement draft and check payable to "Gary Birdsall and Pamela Birdsall" and their attorney, and (3) evidence confirming the policy limits.

Six days before the deadline, the insurance company faxed to the attorney a letter that stated at the top in large boldface it was a "**CLAIM SETTLEMENT**," and the first line of which read, "We accept your offer and agree to pay $100,000 . . . ." The letter also enclosed a standard release and certified proof of the policy limits. The next day, the insurer sent by overnight mail the $100,000 check, payable as requested. Then, four days

1

before the deadline, the insurer faxed another letter to the attorney stating its belief that all three conditions had been met, and asking the attorney to contact him if anything else was required. The attorney did not respond.

Meanwhile, the insurer learned that the release enclosed in the acceptance letter had Gary releasing Helfet and Pamela, listing her as a releasee rather than a releasor, and sent the attorney a corrected version of the release that was received by the attorney 65 minutes after the 3:00 p.m. deadline. The next day, the attorney sent a letter to the insurance company complaining that the original release was not satisfactory—and the corrected release too late.

The attorney thereafter filed a lawsuit for the Birdsalls. Helfet's answer included several affirmative defenses, one of which was the settlement and another of which was comparative fault based on Gary's failure to wear a seat belt. The Birdsalls moved for summary adjudication of the settlement defense, which the law and motion judge granted, and the judge to whom the case was assigned for trial did not allow evidence on the failure to wear a seat belt and refused Helfet's instructions on the issue. Against that background the case proceeded to a jury verdict that awarded Gary $4,642,190 and Pamela $550,000.

Helfet appeals, asserting two arguments, that the trial court erred in: (1) granting summary adjudication of the settlement defense and (2) precluding evidence of, and instruction regarding, Gary's failure to wear a seat belt. We agree with both arguments, and we reverse.

**BACKGROUND**

**The General Setting**

On August 13, 2020, Gary Birdsall, driving a 2013 Ford Econoline E350 commercial cargo van, was stopped on the Bay Bridge when his vehicle

2

was struck from the rear by a Mercedes-Benz driven by Barton Helfet. Helfet struck the back of Gary's van at a high rate of speed, estimated by himself at 50 to 55 miles per hour.[1] The impact pushed Gary's van into a Chrysler Pacifica minivan driven by Edgar DeGiovanni, causing both the van and minivan to rotate up against the left side of the bridge.

As discussed in more detail below, DeGiovanni went to Gary's van and observed that the driver's seat appeared to be in place and upright. There was no partition separating the front seat from the back of the van, which was an empty shell with boxes inside. And DeGiovanni saw Gary lying in the back of the van underneath empty boxes, which "appeared to be produce boxes," "[n]ot like Amazon boxes or file boxes."

The traffic officer at the scene determined that Gary failed to use his seat belt, a conclusion supported by photographs showing the seat belt in the stored position on the frame behind the driver's door.

Gary and his wife Pamela (when referred to collectively, plaintiffs) retained attorney Jacob Shapiro. Mr. Shapiro learned that USAA Casualty Insurance Co. (USAA) insured Helfet, and by letter of October 5 advised USAA of his representation.

By letter of October 6, a USAA representative acknowledged Mr. Shapiro's representation, confirming that USAA would "no longer communicate with your client," further advising that, "[p]ursuant to [Mr. Shapiro's] request," Helfet's insurance policy had "Bodily Injury Liability limits with a $100,000 per person maximum and a $300,000 per accident maximum."

---

[1] An accident reconstruction and biomechanical expert would later estimate that the speed at impact was 65 to 70 miles per hour.

On March 19, 2021, Mr. Shapiro sent to USAA claims handler Jason Thompson a letter that began as follows: "Our firm represents Gary Birdsall and his spouse, Pamela Birdsall, the plaintiffs in the above-referenced accident claim. This letter sets forth a settlement proposal for your company's consideration. Our clients are making this proposal because they are in need of funds at the present time. As evidenced by the over 400,000 miles (photo enclosed) on his 2013 Ford van, Mr. Birdsall was an independently contracting delivery driver and he has been unable to work since the incident. Therefore being in financial distress we are writing to see whether your company will be willing to send us the proceeds under the policy as part of a full and final settlement. This will include any and all claims, including Ms. Birdsall's loss of consortium claim, and Mr. Birdsall will be responsible for any and all liens."

The letter went on to discuss "Liability Issues" and "Medical Treatment & Injury Review," and then set forth a "**POLICY LIMIT SETTLEMENT DEMAND**" that read as follows: "Regarding said limit, this policy limit demand is relying on your company's representation that the USAA Insurance policy covering Mr. Helfet has a limit of $100,000.00 per person for bodily injury. This demand will expire, and be automatically revoked, on April 19, 2021 at 3:00 p.m. This may be the only opportunity USAA will have to resolve this claim within their insured's policy limit. Acceptance can only be made by delivery of the following items to Shapiro Legal Group . . . .

"1) A standard USAA bodily injury release in the amount of $100,000.00 to be executed by Gary Birdsall and Pamela Birdsall . . . . [¶]

"2) A settlement draft in the amount of $100,000.00 payable to 'Gary Birdsall, Pamela Birdsall, and Shapiro Legal Group.' . . . [¶]

"3) A copy of the declaration page for the applicable policy indicating the $100,000.00 per person limit attached to a sworn affidavit by an officer of the insurance company attesting to its authenticity and that said amount represents the bodily injury limit applicable on 8/13/20." (Capitalization and boldface omitted.)

On April 13, Thompson sent Mr. Shapiro a facsimile letter labeled in extra-large, boldfaced font that read at the top "**CLAIM SETTLEMENT**." And the substance of the letter read as follows:

"**Review Claim Settlement**

"April 13, 2021

"Dear Jacob Shapiro,

"We accept your offer and agree to pay $100,000.00 concerning the following claim:

| | |
|---|---|
| "Your client: | Gary Birdsall |
| "USAA policyholder: | Barton M Helfet |
| "Claim number: | 008956651-004 |
| "Date of loss: | August 13, 2020 |
| "Loss location: | San Francisco, California |

"We believe this offer represents the fair value of the claim.

"A claim release is attached. We will forward payment upon receipt of the release signed by your client. Spouse's signature is also required. . . . [¶]

"This offer to settle is all inclusive of any and all medical billing, liens and each party to bear their own fees and costs."

As indicated, Thompson's letter enclosed a USAA "**CA BODILY INJURY RELEASE**," which as pertinent to the issues here provided in part that "The undersigned, <u>Gary Birdsall</u>, for and in consideration of the sum of (One Hundred Thousand Dollars and 00/100) $100,000 do hereby release and

5

forever discharge Barton M. Helfet and Pamela Birdsall (USAA's Insured or USAA) (hereinafter referred to as 'Releasees') . . . ." The release contained the waiver under Civil Code section 1542; and the signature page also contained signature lines for witnesses, a signature line that identified Gary, and another signature line below, which was left blank. The letter also included a certified copy of the declarations page for Helfet's policy, which confirmed the applicable policy limits.

On April 14, USAA sent to Mr. Shapiro by overnight delivery a check dated April 13 in the amount of $100,000 payable, as requested, to "Gary Birdsall and Pamela Birdsall and Shapiro Legal Group." Mr. Shapiro received it on April 15.

On April 15, Thompson sent a facsimile to Mr. Shapiro that read in pertinent part as follows:

"We are contacting your office to follow up with regard to our acceptance of your policy limit demand for your client's claim. You set forth the following conditions as part of your demand:

"1) USAA BI release – which was sent 4/13/21

"2) Settlement draft – which was received by your office 4/15/21

"3) Certified copy of our insured's declarations page – which was sent attached to our correspondence dated 4/13/21

"Our understanding is that we met all required conditions outlined in your demand letter. If you require anything else, please contact USAA."

Mr. Shapiro did not respond.

The next communication came from USAA when, on April 19, Thompson faxed Mr. Shapiro another letter, again confirming the settlement. This facsimile enclosed a revised release that corrected the error on the original release that had mistakenly named Pamela as a releasee. The

6

revised release removed Pamela as a releasee and added her name as a releasor to the signature line.

Mr. Shapiro received the letter and revised release at approximately 4:05 p.m., some 65 minutes after the deadline imposed by the settlement demand letter.

The next day, April 20, Mr. Shapiro sent Thompson a letter that provided in its entirety as follows:

"Dear Mr. Thompson:

"The purpose of this correspondence is to inform you that your company failed to execute the terms of acceptance as outlined in the March 19, 2021 offer. While we are under no legal obligation to explain why, we have decided to do so as a matter of professional courtesy.

"As you know, acceptance required the delivery of three items by the deadline. The first item was a release 'to be executed by Gary Birdsall and Pamela Birdsall'. This is not what USAA sent. (Enclosed) This is not a release to be executed by Pamela Birdsall. Pamela Birdsall should be listed as a releasor along with Gary Birdsall. They are the claimants releasing their claims. Not only is she not listed as a releasor, and not listed in the signature section, but the only place she is listed is as a releasee along with Barton Helfet. She is only listed, falsely, as a USAA insured. This is not a release to be executed by Gary Birdsall and Pamela Birdsall. This is a document to release Pamela Birdsall and Barton Helfet from liability. In short, by any objective measure, this is not a release to be executed by Pamela Birdsall and therefore this is not item one.

"As there was no execution of the terms of acceptance prior to the deadline, we are returning the original check to your company.

7

"We suggest you consult with your legal department. If counsel is assigned we would appreciate them contacting us at their earliest convenience to discuss the further handling of this matter."

**The Lawsuit**

On August 12, represented by Mr. Shapiro, plaintiffs filed a complaint against Helfet. Gary sought compensation for his injuries, medical expenses, and lost income, Pamela for loss of consortium.

On December 1, Helfet filed his answer that included various affirmative defenses, one of which was that "each and every cause of action therein [the complaint] has been previously extinguished by a prior compromise and settlement, with consideration tendered to Plaintiff[s], which then bars this lawsuit."

On January 10, 2022, plaintiffs filed a motion for summary adjudication of this affirmative defense. The motion essentially argued that there was no settlement as a matter of law because the original release was not valid and the corrected release, sent shortly after the purported 3:00 p.m. deadline, was too late. The motion was accompanied by a declaration of Mr. Shapiro that attached 11 exhibits, the correspondence described above. The motion was set for hearing on May 18.

On May 4, Helfet filed opposition. The opposition included a declaration of attorney Dominique Marangoni-Simonsen that had nine attachments, most, if not all, duplicative of those submitted by Mr. Shapiro. Helfet's opposition also included a memorandum of points and authorities that essentially argued: (1) there was mutual consent and thus a valid contract; (2) the original release effectively met the terms of acceptance because the release of Pamela was obviously a typographical error that was of no consequence, and, in any event, easily correctible; and (3) plaintiffs

could not disavow the settlement when they failed to respond to USAA's inquiry sent several days before the deadline for acceptance whether they needed anything else.

Plaintiffs filed a reply, and the matter came on for hearing on May 18, prior to which the law and motion judge issued a tentative ruling granting the motion.[2] A brief hearing was held, at the conclusion of which the court took the matter under submission. That same day, the court signed without change an argumentative two-page order prepared by Mr. Shapiro granting the motion—an order that did not even mention, much less confront, fundamental contract law.

Helfet filed a petition for writ of mandate from the order, which we denied.

On January 18, 2024, the parties appeared for a pretrial conference before the judge to whom the case had been assigned for trial. The judge confirmed the prior order granting the summary adjudication, thus precluding any argument or consideration of it at trial. He also considered plaintiffs' second motion in limine to exclude evidence or argument concerning seat belt use, apparently heard argument on it, and took that issue under submission. The next day, January 19, he heard further argument on the issue, but made no ruling.

Testimony began on January 24, and was taken over seven days. As set forth in Helfet's brief, the evidence included that Gary sustained significant injuries, including multiple fractures to his neck and back, a broken leg, lacerations and bruising on both legs, bruising to his chest and rib cage, and a left-arm degloving where his skin was torn away, and underwent

---

[2]    No tentative ruling is in the record.

9

operation for the broken bones in his neck and back.  He also sustained a mild, but permanent, traumatic brain injury, with small subdural hematomas that caused memory problems, challenges when engaging in family events, some speech and language difficulties, cognitive challenges, and fear of driving that prevented him from continuing to work as a commercial delivery driver.

Helfet contested liability, arguing that he was faced with an emergency situation and that Gary was comparatively at fault for having come to an unexpected stop in moving traffic, presumably because of a mechanical defect.

On February 9, the jury returned a verdict for plaintiffs, finding that Helfet was negligent, that Gary was not, and awarding Gary $4,642,190.86 in damages and Pamela $550,000.  Judgment was entered on February 22.

On May 6, the trial judge awarded plaintiffs costs of $17,608.89, and the judgment was amended to reflect that.

Meanwhile, Helfet moved (1) for new trial or remittitur, (2) to vacate and enter a different judgment, and (3) for judgment notwithstanding the verdict.  On May 6, the trial judge entered orders denying the motions.

On May 20, Helfet filed his appeal from the judgment, the amended judgment, and the orders.

## DISCUSSION

### The Standard of Review

As noted, Helfet first argues that granting summary adjudication was error, our review of which is "procedurally identical" to that for summary judgment.  (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.)  So, "[w]e review a grant of summary judgment de novo; we must decide independently whether the facts not subject to a

10

triable dispute warrant judgment for the moving party as a matter of law. [Citations.]" (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) Put another way, we exercise our independent judgment, and decide whether undisputed facts have been established that negate the defense. (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487.) Doing so, "[w]e accept as true the facts . . . in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them." (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67.) And we must " ' "liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." ' [Citation.]" (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1039, superseded by statute on another ground as stated in *Wawrzenski v. United Airlines, Inc.* (2024) 106 Cal.App.5th 663, 699; see generally *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 253–254.)

As to what that means for us—as it does for the trial court—is described in the leading practical treatise this way: "The court's sole function on a motion for summary judgment is issue-finding, not issue-determination. The judge must simply determine from the evidence submitted whether there is a 'triable issue as to *any* material fact.' [CCP § 437c(c) (emphasis added); [citations]]. [¶] 'There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' [*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850][.] [¶] If there is a single such issue, the motion must be denied. If not, the motion must be granted. [Citation.]

"On a motion for summary adjudication, the test is whether there is any 'triable issue of material fact' as to the particular claim or defense sought

11

to be adjudicated." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2025) ¶ 10:270, italics omitted.)

Applying well settled contract law, we find a triable issue of material fact here.

**Summary Adjudication Was Improperly Granted**

" 'A settlement agreement is a contract, and the legal principles which apply to contracts generally apply to settlement contracts. [Citation.] An essential element of any contract is "consent." [Citations.] The "consent" must be "mutual." [Citations.] . . . .' ' "The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe. [Citation.]" ' " (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 789; accord, *J.B.B. Investment Partners, Ltd. v. Fair* (2019) 37 Cal.App.5th 1, 11.)

"The interpretation of the purported acceptance or rejection of an offer is a question of fact. [Citation.] . . . [And] the test is what a reasonable person in the position of the parties would have thought it meant. [Citation.]" (*Guzman v. Visalia Community Bank* (1999) 71 Cal.App.4th 1370, 1376–1377.)

The outward manifestations here included USAA's letter that read at the top "**CLAIM SETTLEMENT**." That letter opened with the statement, "we accept your offer," and in it USAA sent Mr. Shapiro two of the three items in his demand letter—a standard form release and certified proof of the policy limits. The third item was sent the next day.

Conceding, as they must, that USAA provided the second and third items in Mr. Shapiro's settlement demand—the settlement draft and proof of the policy limits—plaintiffs focus on the release sent with the acceptance

12

letter that had Pamela as a releasee rather than a releasor, asserting it did not comport precisely with the demand letter. But this was obviously a mistake, demonstrated by two facts: the USAA acceptance letter said that the "spouse's signature is also required," and USAA sent Mr. Shapiro a corrected release.

*Panagotacos v. Bank of America* (1998) 60 Cal.App.4th 851 (*Panagotacos*), the primary case on which plaintiffs rely—and the only case relied on by the trial court—is distinguishable. The case involved the possible sale of real property located in Greece, and the sellers, who were located in Germany, specified that the payment be made in Germany and delivery of the money occur no later than April 15, 1994. On January 18, the prospective buyers wrote the sellers and enclosed a copy of the sellers' letter indicating their desire to buy the property. The letter, however, included the statement that " 'both parties will need an attorney in Greece where papers need to be signed and the money and title exchanged.' " (*Id.* at p. 853.) The sellers responded "that payment of the money occur in Germany was essential and that given [the prospective buyers'] remarks about payment in Greece, that they had failed to agree." (*Ibid.*) The parties continued to correspond for several months, and the buyers eventually offered to make payment in Germany, but specified a different deadline. (*Id.* at pp. 853–854.)

The buyers ultimately sued defendant bank, contending that its failure to reconvey a deed of trust from an earlier loan in a timely manner rendered them unable to complete the loan transaction in time to buy the Greek property. (*Panagotacos, supra,* 60 Cal.App.4th at p. 854.) The bank obtained summary judgment, and the Court of Appeal affirmed, holding among other things that there was no enforceable contract to purchase the property, since the buyers had failed to accept the sellers' offer without making additional

13

terms. (*Id.* at p. 856.) It was in that setting that the Court of Appeal used the language on which plaintiffs rely: " '[T]erms proposed in an offer must be met exactly, precisely and unequivocally for its acceptance to result in the formation of a binding contract . . . .' " (*Id.* at p. 855.)

Here, unlike in *Panagotacos*, USAA was not adding a new term to the offer. It did not want Pamela to be a releasee. In short, release of Pamela was not something USAA wanted, let alone insisted upon.

Indeed, a comment in the plaintiffs' own brief indicates that their position is misplaced. This is the comment: "Frankly, looking solely at the document [(i.e., the first release)] without the parole [*sic*] evidence, it would be more reasonable to conclude that Pamela Birdsall's signature codified her consent to Gary Birdsall taking all the insurance money leaving her free to pursue Barton Helfet's personal assets. Pamela Birdsall being released from responsibility for medical expenses by Gary Birdsall would be due consideration. This interpretation would also give meaning to naming Pamela Birdsall as a releasee which appellant's reading does not explain. *We of course know this alternate interpretation was not the intent of the parties from parole [sic] evidence.*" (Italics added.) Indeed: intent is the issue here. It is a fact question.

We find support for our conclusion in "well-established public policy" that settlements are favored and should be encouraged. (*Villa v. Cole* (1992) 4 Cal.App.4th 1327, 1338.) As Division Five of this court described it, quoting two old Supreme Court cases: "Public policy has long supported pretrial settlements. 'Not only will such agreements, when there is no fraud, be sustained by the courts, but they are highly favored as productive of peace and goodwill in the community, and reducing the expense and persistency of litigation.' (*McClure v. McClure* (1893) 100 Cal. 339, 343.) In *Hamilton v.*

14

*Oakland School Dist.* (1933) 219 Cal. 322, the Supreme Court reversed a judgment denying enforcement of a compromise, holding, 'It must be remembered that it is the policy of the law to discourage litigation and to favor compromises of doubtful rights and controversies, made either in or out of court.' (*Id.*, at p. 329.)" (*Gopal v. Yoshikawa* (1983) 147 Cal.App.3d 128, 130–131.)

In conclusion, on this issue we hold—and it is all we hold[3]—that the "outward manifestations" were such that they presented a triable issue of material fact such that a "reasonable person" could find consent, and thus to grant summary adjudication was error.

**The Rulings on the Seat Belt Issue Were Error**

Helfet also argues that the trial court erred in precluding evidence of, and refusing to instruct on, Gary's failure to wear a seat belt. We agree.

As noted, one of Helfet's affirmative defenses was that Gary was comparatively at fault in not wearing a seat belt. And in connection with that defense, Helfet proposed two jury instructions, the first of which was CACI No. 712:

"**712. Affirmative Defense—Failure to Wear a Seat Belt**

"Barton Helfet claims that Gary Birdsall was negligent because he failed to wear a seat belt. To succeed, Barton Helfet must prove all of the following:

"1.    That a working seatbelt was available;

"2.    That a reasonably careful person in Gary Birdsall's situation would have used the seat belt;

---

[3]    Helfet's brief requests that we hold as a matter of law that there was a contract, a heavy request in the best of circumstances. It is particularly inappropriate here, where he did not file any motion below.

15

"3.     That Gary Birdsall failed to wear a seat belt; and

"4.     That Gary Birdsall's injuries would have been avoided or less severe if he had used the seat belt.

"In deciding whether a reasonably careful person would have used a seat belt, you may consider Vehicle Code section 27315."

The second instruction was CACI No. 418, "Presumption of Negligence per se," based on Vehicle Code section 27315, the section cited in CACI No. 212.[4]

### *Additional Background*

Plaintiffs filed a motion in limine on the seat belt issue. Helfet filed opposition, and the motion was first argued on January 18, in proceedings that were not reported, at the conclusion of which the motion was taken under submission. The next day, January 19, in proceedings that were reported, there was additional—and extensive—argument on the seat belt issue, in the course of which the trial judge made two comments that

---

[4]     Vehicle Code, section 27315, enacted in 1992, is a long statute. (Stats. 1992, ch. 122, § 2.)  The first sentence of subdivision (a) reads: "The Legislature finds that a mandatory seatbelt law will contribute to reducing highway deaths and injuries by encouraging greater usage of existing manual seatbelts, that automatic crash protection systems that require no action by vehicle occupants offer the best hope of reducing deaths and injuries, and that encouraging the use of manual safety belts is only a partial remedy for addressing this major cause of death and injury." (Veh. Code, § 27315, subd. (a).)

And the first paragraph of subdivision (d) says this: "(1) A person shall not operate a motor vehicle on a highway unless that person and all passengers 16 years of age or over are properly restrained by a safety belt. . . .  The safety belt requirement established by this paragraph is the minimum safety standard applicable to employees being transported in a motor vehicle." (*Id.*, subd. (d)(1).)

16

appeared favorable to Helfet's position. The first was in response to a comment by plaintiffs' counsel, Mr. Shapiro, when the judge said this:

"THE COURT: Well, no, you just said that it wasn't common sense that there would be different — I mean, that the injuries — well, I guess it's differential. But still, I think it's common sense that he may have been less injured if he wore a seat belt. [¶] I don't think that that is beyond the common sense of — jury — the common person knows that if you wear a seat belt, you're going to be less injured. You just said the opposite of that, except I do agree with you in this case to an extent that differential as to how much different the injuries would have been, had a seat belt been worn, would be extremely difficult for not only an expert but certainly for the jury.

"MR. SHAPIRO: And that's all — that's what I'm arguing, your Honor. And that is the truth. And that is beyond the ability of a lay jury. That's why this is — that's why the second prong cannot be satisfied without expert testimony. That's — it's — thank you, your Honor. I mean, that's – it's very, very simple because they have to be able to quantify.

"THE COURT: I don't know that it's simple."

The second comment was toward the conclusion of the argument, when the following colloquy occurred between the judge and Mr. Shapiro:

"THE COURT: And your motion goes — your motion is saying that if Prong 2 is not satisfied, there should be no mention of whether or not the plaintiff was wearing a seat belt?

"MR. SHAPIRO: A hundred percent correct. Because it's irrelevant. Because it — it's irrelevant because it can't be used — that's the law.

"THE COURT: It's 352. It might be 352. It's definitely relevant.

"MR. SHAPIRO: No, no. I'll tell you why — well, on what issue is it relevant? Comparative fault?

17

"THE COURT: Because it's a car collision. Whether or not someone is wearing a seat belt in a car collision, period, I think, is relevant. Now, it may —

"MR. SHAPIRO: Why?

"THE COURT: Why?

"MR. SHAPIRO: Yeah.

"THE COURT: Because I think, one, it's the law. You should be wearing your seat belt.

"MR. SHAPIRO: When driving.

"THE COURT: When driving. Now, that's actually what I was going to look at. Does this Vehicle Code section apply to this situation where the vehicle is either stalled or stopped in a lane? That, I haven't looked closely enough at the Vehicle Code section to determine whether it applies.

"But assuming it applies, I think it would be relevant. You might convince me that under 352 I should exclude it because Prong 2 isn't showing, and it would prejudice the jury."

In the course of the lengthy argument, the trial judge advised counsel that: "Before I make the ruling in that sense, I do want to get an offer of proof from the defense in the form of the depositions, any excerpts that you are relying on that address the issue of the differential in the injuries to any extent. It doesn't even — I'm not even going to limit it necessarily solely to experts. So if you have — if you think it's relevant, a lay opinion of someone that relates to this, or a medical doctor, I want to just have everything that you are relying on that addresses the second prong, okay?"[5]

---

[5]     The judge's requirement for an offer of proof appears to have been in error. As a leading practice treatise puts it: "An offer of proof generally is not required to preserve an issue for appeal, unless it is a matter outside the

18

The session ended with the understanding that Helfet's counsel would e-mail the court some deposition excerpts she had mentioned. And counsel sent the material, which included an excerpt from expert Dr. Kelkar's deposition, specifically citing to pages 62 and 63, which read as follows:

"Q. . . . [D]o you have any information one way or another whether or not Mr. Birdsall was wearing a seatbelt restraint?

"A. It's difficult to say whether he was or was not wearing it. The seatbelt doesn't do much in terms of a restraint in rear-end collisions, just because your initial movement is rearward and if the seat back yields or fails — collapses backwards, there is no rebound off the seat back. The seatbelt is primarily a frontal restraint.

"So there have been cases where the seat back yields. People ramp up the seat back even while belted. So it's difficult to say whether he was or was not belted. The vehicle is stopped for at least a few seconds before, so maybe the belt was on. Maybe the belt was off. I don't think there's enough information to tell."

As discussed in some detail below, we read "doesn't do much" as being understood by an objective reader that seat belts do "something"—and would thus subject Dr. Kelkar to cross-examination about that.

Despite all that argument on the seat belt issue, the record does not contain any express ruling on it. What is in the record is that on January 24, the first day of testimony, at a sidebar conference during plaintiffs'

---

scope of the direct examination." (Fairbank et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Guide 2024) ¶ 10:55.1 (Fairbank); see Evid. Code, § 354, subd. (c); *People v. Foss* (2007) 155 Cal.App.4th 113, 127 [when a trial court excludes evidence on cross-examination, no offer of proof is necessary to preserve evidence for consideration on appeal so long as it falls within the scope of direct examination].)

19

examination of DeGiovanni, plaintiffs' first witness, Helfet's counsel made a record regarding a "tentative ruling" the trial judge had made. The sidebar discussion was not reported, but as best we can determine, the trial judge indicated at that time he would not permit counsel to question any witnesses on the issue.[6]

On January 26, the third day of testimony—and apparently in the setting where the "liability" evidence was concluded and the trial would have a several-day break—there was early discussion on some jury instructions. The transcript reveals that the judge had previously asked the parties to consider a stipulation on the seat belt issue, and the judge deferred any discussion of CACI No. 712 in order to give the parties additional time to confer on a possible stipulation.

On January 31, the court sent the parties a proposed stipulation,[7] and on February 1, a further conference was held, at which Helfet's counsel stated her client did not "authorize [her] to agree to the stipulation proposed." Then, early on February 5, the judge sent the parties a revised proposed stipulation, which was nearly identical to the initial proposal, with the

---

[6]     Helfet's counsel had reserved her right to re-call DeGiovanni, as well as call the California Highway Patrol Officer who was at the scene of the accident, to testify about their observations pertinent to the seat belt issue.

[7]     The proposed stipulation stated: "Plaintiff Gary Birdsall does not recall whether or not he was wearing a seat belt at the time of the collision. There is no other admissible evidence regarding whether or not Gary Birdsall was wearing a seat belt, or what affect [sic] wearing a seat belt would have had upon the injuries allegedly sustained by Gary Birdsall as a result of the collision. You must not consider whether Gary Birdsall was or was not wearing a seatbelt at the time of the collision, or what affect [sic] a seat belt would have had upon his alleged injuries. Do not speculate as to why this issue is not to be considered during your deliberations. You must decide this case based only on the law and the evidence admitted during the trial."

addition of this in the second sentence: "The seat belt was observed in the stowed position of the B-pillar after the collision." At a brief conference later that day, Helfet's counsel said her client did not authorize her to enter into the revised stipulation.

Later on February 5, the court and parties had a conference settling the jury instructions. The judge first indicated there was no evidence to support items 3 and 4 in CACI No. 712, though quickly saying his concern was "[m]ainly 4, because there's probably enough circumstantial evidence to give the instruction as to 3." Argument ensued, at which Helfet's counsel pointed to the evidence and to several witnesses she would have cross-examined but for the court's earlier ruling. Following that, the judge ruled he would not give the instruction, with this explanation:

"THE COURT: Okay. And *Lara* [*v. Nevitt* (2004) 123 Cal.App.4th 454 (*Lara*)] which the Court has reviewed and read, I agree that it doesn't require expert testimony because it can come in different forms. But it has to still have — there still has to be some evidence in the record to support, substantial evidence, to give the jury instruction.

"So it may not have to come . . . , and . . . I think *Lara* is — I wouldn't say crystal clear on that, but I think that it must come in some form of admissible evidence to support a substantial finding to give the jury instruction.

"I agree with you that it may not necessarily have to be in the form of expert testimony. But in this case, I don't know if we have it in any form. Or at least not enough in any form to support a substantial evidence finding by this Court to give that instruction. [¶] . . . [¶] . . .

21

" . . . So at this time I'm going to deny the request for 712, as the Court is finding that there's not substantial evidence in the record to support giving of the instruction."

This, we hold, was error—indeed, the last error concerning the seat belt issue. The first was in not allowing any evidence at all.

### *Preclusion of Seat Belt Evidence Was Error*

As best we can determine, in the history of California jurisprudence there have been four published opinions addressing the need for expert testimony on the seat belt issue: *McNeil v. Yellow Cab Co.* (1978) 85 Cal.App.3d 116 (*McNeil*); *Truman v. Vargas* (1969) 275 Cal.App.2d 976 (*Truman*); *Franklin v. Gibson* (1982) 138 Cal.App.3d 340 (*Franklin*); and *Lara*, *supra*, 123 Cal.App.4th 454.[8] As is apparent, three of the four predate the 1992 enactment of Vehicle Code section 27315 that mandates seat belt use in California. Two of the cases, *Truman* and *Franklin*, held that expert testimony was required in the settings there. The other two, *Lara* and *McNeil*, held that it was not. Plaintiffs rely primarily on *Franklin* (and to a lesser extent, *Truman*), Helfet on *Lara*. Helfet has the better of it.

Plaintiffs have cited no case, and we are aware of none, that holds that evidence of seat belt usage—perhaps more accurately, non-usage—is

---

[8] There are a few other published opinions involving seat belts, but not addressing the expert testimony question, including these: *Housley v. Godinez* (1992) 4 Cal.App.4th 737, holding that failure to wear seat belt was not a supervening cause; *Hardison v. Bushnell* (1993) 18 Cal.App.4th 22, holding that Vehicle Code section 27315 applied in civil actions (though mentioning in passing an expert testimony requirement); and some cases addressing expert testimony in products liability cases (e.g., *General Motors Corp. v. Superior Court* (1996) 48 Cal.App.4th 580 [defective design of seat belt]; *Endicott v. Nissan Motor Corp.* (1977) 73 Cal.App.3d 917 [alleged defective seat belt that ruptured]).

inadmissible. Neither of the cases plaintiffs rely on, *Truman* or *Franklin*, so holds. In fact, both cases had admitted such evidence.

*Franklin* noted there was evidence in the cross-examination of one of the plaintiffs that he (and his wife) were not wearing seat belts. (*Franklin, supra*, 138 Cal.App.3d at p. 342.) The error was in allowing the jury to consider the issue without expert testimony. (*Id.* at p. 343.) Further, *Franklin* said this: "We do not intend to establish a duty to wear seat belts, nor do we intend to extend the rationale of the *Truman* case, which we accept. The burden is upon the defendant to prove whether in the circumstances of the case the plaintiffs in the exercise of ordinary care should have used the seatbelts available to them, and what injuries plaintiffs would have sustained, according to expert testimony, if the seat belts had been used." (*Franklin, supra*, 138 Cal.App.3d at p. 344.) As noted, since 1992, California law imposes a duty to wear a seat belt.

*Truman* is similar. There, Truman, a passenger in a car that collided with Vargas's car, sued Vargas. The jury returned a verdict for Vargas. Truman moved for new trial and judgment notwithstanding the verdict, both of which were granted. (*Truman, supra*, 275 Cal.App.2d at p. 978.) Vargas appealed and the Court of Appeal affirmed. Doing so, the court noted that "evidence that Truman knew about the seat belt and failed to use it" was "received without objection." (*Ibid.*) Quoting at length from discussions at the trial court, the Court of Appeal noted a distinction between failing to use a seat belt as a cause of the accident and as a cause of injuries, and quoted this statement of the trial judge: " 'Now, if, we will say, a man is riding in a car equipped with seat belts and he doesn't put his seat belt on and there is an accident and he is thrown out into the street and another car runs over him, why, that could be submitted to the jury on their common knowledge as

23

to whether or not the non-wearing of a seat belt was a proximate cause of the injuries he suffered.

" 'Now, unless the non-wearing of a seat belt is a proximate cause or an aggravating cause of injuries, then the fact that he was negligent is of no consequence, and in order to determine whether the non-wearing of a seat belt is a proximate cause of more severe injuries, you have to have testimony on it. That testimony would have to be by somebody who would be qualified to testify as to such matters." (*Truman*, *supra*, 275 Cal.App.2d at pp. 980–981.)

Later, after all the evidence was in and the instructions were again being discussed with counsel, the trial judge announced he would instruct the jury to ignore the matter of the seat belt evidence, and admonished Vargas's attorney he must not argue or mention to the jury the matter of seat belts. He gave the jury such an instruction. (*Truman*, *supra*, 275 Cal.App.2d at p. 981.)

Despite that, the jury somehow ruled for Vargas, leading to Truman's successful post-trial motions and their being affirmed on appeal, with this holding: "As to the case in hand we hold that it was a question of fact whether in the exercise of ordinary care Truman should have used the seat belt and that this question should be answered from a consideration of all the circumstances in evidence and any expert testimony as to the efficacy of seat belts, insofar as the same was known, or in the exercise of ordinary care would have been known to Truman. [¶] We hold that upon the facts of this case the trial court correctly ruled that it was not for nonexpert minds to

24

determine what consequences to Truman would have been if he had been using the seat belt." (*Truman*, *supra*, 275 Cal.App.2d at p. 982.)[9]

In short, in all four of the cases dealing with the issue of the need for expert testimony or not, the evidence of the non-use of seat belt was admitted. The second comment of the trial judge on January 19 indicates that such was his view as well, who, as quoted above, responded to plaintiffs' counsel that whether Gary was wearing a seat belt or not is "definitely relevant." Asked by counsel why, the trial judge said, "Because it's a car collision. Whether or not someone is wearing a seat belt in a car collision, period, I think, is relevant," and "[b]ecause . . . it's the law. You should be wearing your seat belt." The evidence should have been admitted. (See Evid. Code, § 351 ["Except as otherwise provided by statute, all relevant evidence is admissible"].)[10]

In sum, no case holds that seat belt evidence is inadmissible. The question is, whether the jury can rely on it without an expert. And as the cases recognize, sometimes the answer is yes. And the refusal to give CACI No. 712 was error.

### *Refusal of CACI No. 712 Was Error*

---

[9] We note that *Truman* was decided in 1969, before California adopted comparative negligence in *Li v. Yellowcab* (1975) 13 Cal.3d 804. Thus, the effect of Truman's not using a seat belt would have barred his entire case, a drastic result for an innocent passenger in a negligently driven vehicle.

[10] As the trial judge alluded to, there might be an Evidence Code section 352 issue. And if it were to develop that expert testimony were in fact required in the particular setting, the trial judge could, as in *Truman*, instruct the jury that it must disregard the evidence. (See, e.g., CACI No. 5002 [where court grants a motion to strike testimony at trial, court may instruct the jury, "You must totally disregard that testimony. You must treat it as though it did not exist."].)

25

*Lara, supra,* 123 Cal.App.4th 454 is persuasive. Plaintiff Lara was asleep in the sleeper berth of his son's big rig truck as the son drove on the highway. Defendant Nevitt lost control of his car and collided with the truck. Lara was not wearing a seat belt, and was thrown forward, striking his head and shoulders against cabinets in the sleeping berth. (*Id.* at p. 457.) Lara's son testified that the seat belt fit tightly and prevented a sleeping passenger from moving at all. (*Id.* at p. 458.) Defendant called an orthopedic expert, who opined that had Lara worn his seat belt, "it would have been less likely that he would sustain significant injuries." (*Ibid.*) Asked to quantify the percentage difference in the risk of injury if Lara had used the seat belt, the expert said only that "he would be 'totally winging it.'" (*Ibid.*) The jury awarded Lara damages for his injuries, but also found him 50% at fault for not wearing a seat belt. (*Id.* at p. 457.)

Lara appealed, arguing that there was no substantial evidence to support either the giving of an instruction on the seat belt defense or the verdict that he was negligent. The appellate court rejected the argument, holding that no expert testimony was required under the circumstances. Discussing *Truman,* the Court of Appeal noted this: *Truman* "makes clear that the question whether expert testimony is required to submit the seat belt defense to the jury must be answered by applying 'the general rules governing the use of expert testimony. If the fact sought to be proved is one within the general knowledge of laymen, expert testimony is not required; otherwise the fact can be proved only by the opinions of experts.' [Citation.] [¶] In the circumstances of the *Truman* case, the court found expert testimony was necessary, but reasoned that, 'There will be an infinite variety of circumstances in which the question will arise whether expert testimony will be legally necessary or merely helpful in casting the greatest possible

26

light upon the problem. *Expert testimony should not be required to prove that one who is firmly strapped down by his seat belt will not be thrown out of the car.'* " (*Lara, supra,* 123 Cal.App.4th at p. 459, quoting *Truman, supra,* 275 Cal.App.2d at p. 982, italics added.)

Distinguishing the earlier cases, *Lara* held that "expert testimony was not necessary since the jury was not required to distinguish among injuries in terms of cause without a factual basis." (*Lara, supra,* 123 Cal.App.4th at p. 460.) "The jury could infer using common sense that if he could not have moved at all, Lara would not have rolled around and hit the cabinets." (*Ibid.*, fn. omitted.) And it added: "In this day and age in southern California, where virtually every citizen either drives or rides in a vehicle, no expert testimony is necessary to support the reasonable inference that Lara would have suffered less injury if he had been wearing a seat belt." (*Id.* at p. 458.)

*McNeil, supra,* 85 Cal.App.3d 116 held similarly, in a case presenting the issue in an unusual way. There, plaintiff McNeil was a passenger in the back seat of a taxicab that was involved in an intersection accident in which plaintiff was thrown from the right rear seat to the front area where he struck some objects, sustaining injuries. The trial court found "that the taxicab was equipped with seat belts, but they were not visible to plaintiff, and "that it was not established by expert testimony that the apparent unavailability to plaintiff of seat belts proximately caused his claimed injuries." (*Id.* at p. 118.) Following a trial to the court, the court found the taxicab company and its operator liable. (*Ibid.*)

McNeil appealed, and the Court of Appeal reversed, stating, as follows:

"According to *Greyhound Lines, Inc. v. Superior Court* (1970) 3 Cal.App.3d 356, 360, under current California decisional law, the trier of fact decides whether a common carrier's failure to provide seat belts amounts to

27

negligence. It seems to us that the rule should be the same with respect to a failure to provide *visible* seat belts. This leaves as the sole question on this appeal whether expert testimony that plaintiff's nonuse of seat belts proximately caused his claimed injuries was legally necessary or merely helpful. (See *Truman*[, *supra*,] 275 Cal.App.2d [at p.] 982.) According to this decision, if the facts sought to be proved are within the general knowledge of laymen, expert testimony is not required. (*Ibid*.)

"We hold that on the record before us expert testimony was not required. Plaintiff testified that he was not wearing a seat belt because he could not find any, and that the impact of the collision threw him from the right rear seat of the taxicab to its left front area where his head and arm struck some objects with the result that, presumably among other injuries, he broke an arm. It seems clear, simply as a matter of common sense, that the absence of seat belt restraint under these circumstances proximately caused at least some, if not all, of plaintiff's claimed injuries. The subject of inquiry, namely, the question whether the absence of seat belt restraint under these circumstances constituted a proximate cause of plaintiff's claimed injuries, was one of such common knowledge that persons of ordinary education could reach an intelligent answer. [Citation.] Stated otherwise, answering this question is not beyond the competence of persons of common experience, training and education. [Citation.] In sum, expert evidence on this issue of the causation of plaintiff's claimed injuries would be helpful, but not legally necessary." (*McNeil, supra*, 85 Cal.App.3d at pp. 118–119, fn. omitted.)

Likewise here.

Arguing against *Lara*—which plaintiffs call the "*Lara* exception,"

28

apparently to *Franklin*[11]—plaintiffs go on for several pages about the claimed "complexity" and "complicated" nature of the facts, including, for example, discussing for over a page Gary's "injuries and pre-existing spinal conditions [that] were complicated." And, setting forth the evidence favorable to plaintiffs' version of the facts, the brief says things like this: "This first impact was 'clearly the most significant impact' involving the Ford van during the incident. The backwards force was enough, after the seat collapsed, to move Mr. Birdsall to the cargo compartment of the van." And this: "The tremendous initial impact is legally significant because it represents a mechanism of injury which Mr. Birdsall suffered immediately and irrespective of seatbelt use."

At an earlier point plaintiffs' brief makes this statement: "The collapsed driver's seat was photographed after the collision. [Citation.] The passenger seat, empty and therefore having no weight on it at the time of the impact, remained upright." And, it adds, Helfet's argument "that Mr. Birdsall would have been found in the back of the van even if the seat had not collapsed, is not scientifically possible. (AOB at 56.) It is fundamentally flawed because Mr. Birdsall can only go backwards once the driver's seat collapses and the seat is no longer restraining him. [¶] The collapsed driver's seat was photographed after the collision. The passenger seat, empty and therefore having no weight on it at the time of the impact, remained upright."

---

[11] If the meaning of this reference is to imply that *Franklin* is a general rule, we disagree. We fail to see how one six-page case, with little analysis, decided years before the enactment of Vehicle Code section 27315, can be a general rule.

29

"Seat collapsed." "Collapsed driver's seat." That may be plaintiffs' version of the facts. There is another.

To begin with, as to the photograph of the claimed "collapsed driver's seat," plaintiffs' biomechanical expert acknowledged that someone could have moved it there after the accident. But more significant is the testimony of DeGiovanni, who has bachelor's and master's degrees in engineering and a master's degree in nuclear engineering, and was on his daily commute from his home in San Francisco to his job at Livermore National Laboratory. And one reading DeGiovanni's testimony comes away with the impression of a thoughtful, conscientious observer of what he experienced, and what he saw, which included this:

DeGiovanni's vehicle was struck by Gary's van and pushed to the side of the bridge, ending up perpendicular to it. Getting out of his vehicle, DeGiovanni walked over to the van and looked in, and "didn't see anybody inside." DeGiovanni then walked to Helfet's Mercedes, at which point emergency services arrived. DeGiovanni then returned to the van, looked in again, and saw a bunch of boxes in the back "disheveled and piled up. And [he] saw a leg, a foot, kick out of the boxes."

That ended the direct examination, upon which a bench discussion was held, following which DeGiovanni would go on to testify that he saw a "single seat in the van"—and "no passenger seat." He went on to describe that single seat, confirming that the "driver's seat was yellowish in color" and looked "like it was in place." It was "upright," not broken.

Eschewing any reference to this testimony, plaintiffs' brief dismisses it with this cavalier statement: "Mr. DeGiovanni, after being involved in a very traumatic event himself, testified he saw the van had only one front seat, a

30

driver's seat, and had no passenger seat. Of course we know his testimony that the van had no passenger seat is incorrect."[12]

Such dismissiveness has no place here. As we ourselves have noted, because the issue involves an error regarding jury instructions and the prejudicial effect of such error, " '[w]e must assume that the jury, had it been given proper instructions, might have drawn different inferences more favorable to the losing [party] . . . .' " (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 655.) So, "we recite the facts in the light most favorable to the claim of instructional error [citations] and we assume the jury might have believed [Helfet's] version of the facts . . . . [Citations.]" (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 839, fn. 1, disapproved on another ground in *People ex rel. Garcia-Brower v. Kolla's, Inc.* (2023) 14 Cal.5th 719, 734.)

But there is more on the seat belt issue than just DeGiovanni's testimony. As quoted in the e-mail sent to the trial judge, plaintiffs' biomechanical expert testified at deposition that "[t]he seatbelt doesn't do much in terms of restraint in rear-end collisions." "[D]oesn't do much" is not do nothing, and as we read it must mean the seat belt "does something." And the expert can be cross-examined as to that something, as all leading California commentaries describe. Thus:

Jefferson: "[C]ross-examination is within the scope of the examination if it relates to a matter *expressly* testified to or to a matter impliedly testified to by the witness on direct examination." (Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. 2025) § 28.93.)

---

[12] It bears noting that in closing argument plaintiffs' counsel referred in several places to DeGiovanni's testimony and how accurate and persuasive it was.

And the Rutter Group:  "Cross-examination is generally proper on any matter touched upon on direct.  Direct examination on any aspect of an event or transaction 'opens the door' to cross-examination on '[a]ll relevant and material matters preceding, concurring with, or following' that testified to on direct.  [Citations.]"  (Fairbank, *supra*, ¶ 10:35, italics omitted.)  " 'Scope of the direct' includes both the matters the witness actually testified to as well as reasonable inferences that may be drawn therefrom:  'He can be cross-examined with respect to facts or denials which are *necessarily implied* from the testimony in chief, as well as with respect to facts which he expressly states.' "  (*Id.*, ¶ 10:36, citing *People v. Wrigley* (1968) 69 Cal.2d 149, 162, emphasis added.)

And Witkin:  "The restrictive rule does not prevent the cross-examiner from seeking new facts concerning the matters raised in the direct.  Testimony on direct of a very general character may open up a broad field of inquiry, and the same is true of testimony on direct that contains a broad denial of an issue of the case.  It is sometimes said that the direct examination, by touching on one phase of a matter, 'opens the door' to the fullest inquiry concerning it."  (3 Witkin, Cal. Evidence (6th ed. 2025) Presentation at Trial, § 258.)

And our esteemed colleague Justice Simons:  "Courts should normally permit wide latitude in applying the statutory limitation that cross-examination is limited to the scope of direct.  The cross-examiner should be permitted to approach a single subject matter from more than one vantage point."  (Simons, Cal. Evidence Manual (2024) Examination of Witnesses, § 3:18.)

Were Helfet allowed such cross-examination, the jury could have found that a seat belt would have made a difference, particularly if the jury determined that the driver's seat did not collapse.

Additional support for such conclusion is Gary's brain injury. As plaintiffs' brief describes it, Gary "also sustained a mild traumatic brain injury. Per Dr. Yablon this was caused by the initial impact shaking his brain and causing subdurals." Later, plaintiffs' brief says, "whether this head impact was with the headrest upon the initial collision moving Mr. Birdsall's head backwards at 30 mph, or some subsequent trauma in the back of the van, was not discussed"—not discussed, of course, because the trial judge would not allow it.

Further on this point, vascular neurologist Dr. Venkat opined that Gary's brain injury was caused by head trauma:

"Q. Okay. So did Mr. Birdsall suffer a mild traumatic brain injury as a result of the August 2023 collision?

"A. Yes.

"Q. What were the main factors leading you to that conclusion?

"A. Multiple factors. [¶] The first one is that there was a head impact from the traumatic brain injury and there was bleeding that was identified; in other words, structural injury to the brain identified on multiple CT scans."

Later, Dr. Venkat confirmed that: "[T]he subdural hematomas happened because of the impact to the head."

As plaintiffs' counsel acknowledged in the course of an argument early at trial, a seat belt stops the head from going forward. As plaintiffs' brief puts it, "a seatbelt is a frontal restraint stopping the occupant from moving

33

forwards not backwards." There was no evidence that the "impact to the head" was from Gary striking anything in front of him. The jury could have concluded it was when Gary was thrown however many feet into the back of the van.

Finally, we note the closing argument of plaintiffs' counsel, who emphasized the "extremely violent collision", going on with this: "You heard from [the biomechanical expert], who calculated the backward force on Mr. Birdsall's neck, back, and head, it was in the range of 25 to 30 delta-vs, causing Mr. Birdsall's body to go backwards at 25 to 30 miles per hour in a 10th of a second, sufficient to break the front seat and beyond the range of crash testing." But Helfet should have been allowed to argue that the only reason Gary was found in the back of the van was because he was not wearing a seat belt, whether the seat collapsed or not.

It is noteworthy that during the questioning of various witnesses, including apparently Gary, some jurors—all laypersons, using their common sense—submitted questions they wanted asked of the witnesses, all of which the judge refused. The questions included these:

"Was Mr. Birdsall wearing a seatbelt?"

"Is there an EMT report that indicates if Mr. Birdsall was wearing his seat belt"?

"Do you remember wearing a seatbelt?"

"Is the force strong enough to thrust from or out of seat belt if a restraint was being worn[?]"

"Were you (are you) able to draw any conclusions from the materials you examined about whether Mr. Birdsall was wearing a seatbelt at the moment of impact?"

*Lara* referred to the undoubted experience the Southern California jurors would have had in 2004 just from driving or riding in a vehicle. A fortiori here in the 2024 trial, where Northern California jurors have since 1992—for most jurors, their entire adult life—lived with a Vehicle Code section mandating seat belt use, not to mention the constant admonitions, reminders, slogans, and signs telling of the significance of seat belts. That experience, that common sense was improperly disregarded here.

The law is well settled, as we confirmed in *Veronese v. Lucasfilm Ltd.* (2012) 212 Cal.App.4th 1, 28–29:

"The trial court must instruct on the law applicable to the facts developed by the evidence and every reasonable theory that the evidence supports. (*Herbert v. Lankershim* (1937) 9 Cal.2d 409, 482; *Harris v. Oaks Shopping Center* (1999) 70 Cal.App.4th 206, 208.) . . . [¶]

"Witkin distills the rule this way: '[I]t is the duty of the court to see that jurors are guided on controlling legal principles, and the complete failure to instruct properly on a basic issue may be reversible error. (See *Thomas v. Buttress & McClellan* (1956) 141 Cal.App.2d 812, 819 [trial court should have instructed jury as to correct measure of damage on its own motion]; *Lysick v. Walcom* (1968) 258 Cal.App.2d 136, 157 [trial court should have instructed jury that negligence was established as matter of law]; *Paverud v. Niagara Machine & Tool Works* (1987) 189 Cal.App.3d 858, 863 [reversible error to fail to instruct on superseding cause which was basic defense][, disapproved on another ground in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572]; [Citations.]' (7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 261, pp. 315–316.)"

Such reversible error is present here.

## DISPOSITION

The judgment and the amended judgment are reversed, and the matter is remanded (1) with instruction to the trial court to vacate its order granting the motion for summary adjudication and to enter a new order denying the motion and (2) for a new trial.  Helfet is entitled to his costs on appeal.

_____

              RICHMAN, J.

We concur.

_____

STEWART,  P.J.

_____

DESAUTELS, J.

(A170596P)

City and County of San Francisco
Hon. Christopher C. Hite

Counsel:

Niddrie Addams Fuller Singh, John S. Addams; Mcnamara, Ambacher, Wheeler, Hirsig & Gray, Wilma J. Gray for Defendant and Appellant.

Shapiro Legal Group, Jacob Shapiro; for Plaintiffs and Respondents.